UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SHEMICK F. WATTS,

Petitioner,

v.

ROBERT W. FOX,

Respondent.

No. 2: 15-cv-2199 MCE KJN P

ORDER AND FINDINGS AND RECOMMENDATIONS

I. Introduction

Petitioner is a state prisoner, proceeding without counsel, with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2013 conviction for attempted murder (Cal. Penal Code §§ 664, 187(a)), and enhancements for infliction of great bodily injury (Cal. Penal Code § 12022.7(a)) and personal use of a knife (Cal. Penal Code § 12022(b)(1)). (CT at 313.) Petitioner is serving a sentence of 23 years. (Id.)

The petition raises four claims: 1) insufficient evidence; 2) prosecutorial misconduct; 3) jury instruction error; and 4) Brady[1] violation. (ECF No. 1.) Petitioner also raises an ineffective assistance of counsel claim in a supplemental petition. (See ECF Nos. 21, 28.)

////

---

[1] Brady v. Maryland, 373 U.S. 83 (1963).

For the reasons stated herein, the undersigned recommends that the petition be denied.

II. <u>Standards for a Writ of Habeas Corpus</u>

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. <u>See</u> <u>Wilson v. Corcoran</u>, 562 U.S. 1, 5 (2010); <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. <u>Thompson v. Runnels</u>, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing <u>Greene v. Fisher</u>, 132 S. Ct. 38, 44-45 (2011)); <u>Stanley v. Cullen</u>, 633 F.3d 852, 859 (9th Cir. 2011) (citing <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000)). Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." <u>Stanley</u>, 633 F.3d at 859 (quoting <u>Maxwell v. Roe</u>, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." <u>Marshall v. Rodgers</u>, 133 S. Ct. 1446, 1450 (2013) (citing <u>Parker v. Matthews</u>, 132 S. Ct. 2148, 2155 (2012) (<i>per curiam</i>)). Nor may it be used to "determine whether a particular rule of law is so

2

widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct.  Id.  Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue.  Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. [2]  Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams v. Taylor, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams v. Taylor, 529 U.S. at 411.  See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its 'independent review of the legal question,' is left with a 'firm conviction' that the state court was "erroneous.'").  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement."  Richter, 562 U.S. at 103.

---

[2]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289, (2013) (citing Richter, 562 U.S. at 98. If a state court fails to adjudicate a component of the petitioner's federal claim, the component is reviewed de novo in federal court. Wiggins v. Smith, 539 U.S. 510, 534 (2003).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no

reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." <u>Richter</u>, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. <u>Stancle v. Clay</u>, 692 F.3d 948, 957 & n.3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." <u>Richter</u>, 562 U.S. at 98. This court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." <u>Id.</u> at 101. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" <u>Walker v. Martel</u>, 709 F.3d 925, 939 (9th Cir. 2013) (quoting <u>Richter</u>, 562 U.S. at 98).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. <u>Stanley</u>, 633 F.3d at 860; <u>Reynoso v. Giurbino</u>, 462 F.3d 1099, 1109 (9th Cir. 2006).

III. <u>Factual Background</u>

The opinion of the California Court of Appeal contains a factual summary of petitioner's offenses. After independently reviewing the record, the undersigned finds this summary to be accurate and adopts it herein:

> The stabbing occurred in the late morning of October 18, 2011, at a Motel 6 parking lot in Stockton, some time after defendant's car had been repossessed from the parking lot. The victim was making trips back and forth to his car, getting ready to leave the motel after spending the night there with out-of-town family and friends. Defendant, who was wearing gold teeth (also referred to as a "gold grill" at trial), approached the victim and asked if he knew what had happened to his car. The victim, who had seen the repossession taking place, told defendant "it got repo'ed the night before." Defendant accused the victim of taking his car and tried to punch the victim in the face. The two started fighting, and defendant stabbed the victim six times.
>
> The victim's brother's friends, Jonathan C. and Karen C., who were also staying at the motel, were in their car at the time of the stabbing.

5

Jonathan C. identified defendant in court as the victim's assailant. Karen C. also identified defendant in court as the stabber. After defendant stabbed the victim, defendant went up to the C.'s car and asked Jonathan C., "Do you want some of this." The C.'s "pulled away." Defendant went down a little alley. The C.'s went looking for defendant, but they could not find him.

The victim identified defendant as the stabber two days after the attack, in a photographic six-person lineup prepared by Detective Charles Harris of the Stockton Police Department. The victim could not identify defendant in court as the stabber.

Defendant was arrested in February 2012. Six days later, Detective Harris went to see defendant in jail. Defendant "had gold teeth on the top portion of his mouth."

At trial, defendant testified that he was staying at Motel 6 on October 17, 2011, but he did not accuse anyone of taking his car or stab anybody at the motel.

People v. Watts, 2014 WL 6480473 at *1 (Cal. App. 2014).

IV.   Claim One:  Alleged Insufficient Evidence

A.  Legal Standard

The Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Id. at 326.  State law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law."  Coleman v. Johnson, 566 U.S. 650, 655 (2012) (quoting Jackson, 443 U.S. at 319).

As the Supreme Court has stated,

Jackson ... makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court

may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam) (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)).

　　2. Opinion of California Court of Appeal

The California Court of Appeal is the last state court to issue a reasoned opinion addressing petitioner's claim alleging insufficient evidence. The California Court of Appeal denied this claim for the reasons stated herein:

> Defendant contends there was insufficient evidence to support his attempted murder conviction because the evidence failed to establish he was the stabber. He argues the evidence was insufficient because "[n]o prosecution witness identified [defendant as the stabber] both before and at trial" and "[t]hree of the four prosecution witnesses changed their position on identification...."

> Defendant's argument misapprehends our standard of review. It is not an appellate court's function to reweigh the evidence. "We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (People v. Maury (2003) 30 Cal.4th 342, 403.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (People v. Young (2005) 34 Cal.4th 1149, 1181.)

> Here, there was substantial evidence defendant was the stabber. The victim identified defendant as the stabber two days after the attack. Jonathan C. identified defendant in court as the victim's assailant. And Karen C. identified defendant in court as the stabber. This evidence, individually or cumulatively, was substantial evidence that defendant was the stabber.

People v. Watts, 2014 WL 6480473 at *1-2.

　　3. Summary of Evidence

　　　　a. Prosecution Witnesses

*Jessica Bennett*

Witness Jessica Bennett identified petitioner as being present at the scene, although she did not identify him as the stabber. Bennett testified that on the morning of the incident, she was in the hotel room and heard a car beeping. (RT at 54.) Bennett opened the door and looked out. (Id.) Bennett saw a man, later identified as petitioner, looking at her. (Id. at 54, 70.) He was

standing next to her friend's vehicle.  (<u>Id.</u> at 59.)  Petitioner was about one to two feet from the

vehicle, and about 20 or 30 feet from Bennett.  (<u>Id.</u> at 60.)

Bennett then saw the victim, Steven, coming around the corner, holding himself, and

saying he got stabbed.  (<u>Id.</u> at 55.)

Bennett testified that she had seen petitioner earlier that morning when she saw him

looking in their hotel room window as he walked by.  (<u>Id.</u> at 60.)  Petitioner looked in just for "a

second" as he walked by.  (<u>Id.</u>)  Ten minutes later, Bennett went to the car to put her bags in the

trunk.  (<u>Id.</u>)  Bennett then saw petitioner and a woman pacing back and forth outside the hotel.

(<u>Id.</u> at 61.)  Bennett was approximately 30 feet away from petitioner while she observed him

pacing.  (<u>Id.</u> at 85.)  Bennett testified that she observed petitioner pacing for maybe five minutes.

(<u>Id.</u> at 70.)  On cross-examination, Bennett testified that she had also seen petitioner the night

before as he passed by her room.  (<u>Id.</u> at 88.)

At the hospital, approximately two to three hours after the incident, Bennett was shown a

photo line-up.  (<u>Id.</u> at 94-95, 101.)  After looking at the photos, Bennett stated that she did not

recognize anyone in the line-up.  (<u>Id.</u> at 99.)  Bennett testified that petitioner had a beard on the

morning of the incident, although he did not have a beard in the photo line-up.  (<u>Id.</u> at 122.)

Bennett testified that petitioner had a "thin" beard on the morning of the incident.  (<u>Id.</u> at 119.)

Bennett also testified that on the morning of the incident, she observed petitioner's gold teeth.

(<u>Id.</u> at 125.)

*Chris Harleman*

Witness Chris Harleman testified that on the morning of the incident, he was in the hotel

room.  (<u>Id.</u> at 144.)  Harleman's brother, Steven, came into the hotel room and said that he had

been stabbed.  (<u>Id.</u>)  Harleman asked him who stabbed him.  (<u>Id.</u>)  His brother responded, "the

guy with the car... the repo."  (<u>Id.</u> at 146.)  Harleman asked, "the guy that got repo'ed?"  (<u>Id.</u>)  His

brother responded, "yes, the car that got repo'ed this morning."  (<u>Id.</u>)  Harleman understood who

his brother meant, because earlier that morning Harleman looked out the hotel room window and

saw a car getting pulled by a "repo truck not a regular tow truck."  (<u>Id.</u> at 147.)  The car was

either a light-colored Buick or a Cadillac.  (<u>Id.</u>)  Harleman did not see the person who stabbed his

8

1    brother.  (<u>Id.</u> at 172.)

2        *Steven Harleman*

3        Stabbing victim Steven Harleman testified that on the morning of the incident, he was

4    packing up the car at the hotel.  (<u>Id.</u> at 182.)  During one of the trips to the car, an African

5    American man, with gold teeth, approached him and asked if he knew what happened to the car

6    "that was parked back there." (<u>Id.</u> at 182, 184.)  Harleman had seen the man walking around

7    minutes before with an African American woman.  (<u>Id.</u> at 183.)  After the man asked Harleman

8    about the car, Harleman told him that it got repo'ed the night before.  (<u>Id.</u>)  After this, the man

9    said that it was the white boys that took it.  (<u>Id.</u> at 185.)  Harleman understood the man to be

10   accusing Harleman and his brother and friends of taking the car.  (<u>Id.</u>)  Harleman responded,

11   "What are you trying to say?" (<u>Id.</u>)  The man then swung at Harleman.  (<u>Id.</u>)  The man and

12   Harleman then started fighting.  (<u>Id.</u>)  During the fight, the man stabbed Harleman.  (<u>Id.</u>)

13       Harleman testified that the man who attacked him was African American with gold teeth.

14   (<u>Id.</u> at 182.)  Harleman testified that the gold teeth were "probably the top four" top teeth.  (<u>Id.</u> at

15   214.)  Harleman had seen the man and a woman walking around together a couple of minutes

16   earlier.  (<u>Id.</u> at 183.)  At trial, Harleman could not identify petitioner as the attacker.  (<u>Id.</u> at 217.)

17       After his surgery at the hospital, police showed Harleman a photo lineup.  (<u>Id.</u> at 227.)

18   Harleman picked photo number two out of the photo lineup.  (<u>Id.</u> at 232.)  Harleman testified that

19   when he was shown the photo lineup, he was on morphine that made him "foggy."  (<u>Id.</u> at 233.)

20       *Jonathan Cooke*

21       Witness Jonathan Cooke testified that on the morning of the incident, he was helping to

22   pack everything up at the motel.  (<u>Id.</u> at 355.)  Cooke was in the car waiting for the others.  (<u>Id.</u> at

23   358.)  While he was in the car, he saw a man pacing around the parking lot.  (<u>Id.</u> at 359.)  The

24   man was African American with gold teeth in the front.  (<u>Id.</u>)  Cooke testified that the "whole top

25   was gold," in describing the gold teeth.  (<u>Id.</u> at 381.)  The man was with an African American

26   woman.  (<u>Id.</u> at 361.)  Cooke observed this man for around ten minutes.  (<u>Id.</u> at 361.)  Cooke saw

27   the man confront Steven Harleman.  (<u>Id.</u> at 369.)  Cooke saw them fighting.  (<u>Id.</u> at 376.)  At trial,

28   Cooke testified that he was 70% to 80% certain that petitioner was the African American man

with gold teeth who attacked Steven Harleman.  (Id. at 380.)  At the hospital, Cooke was shown a

photo line-up.  (Id. at 384.)  Cooke picked out two photos from the line-up of men.  (Id. at 389.)

The two photos picked by Cooke were not photos of petitioner.  (Id. at 419-20.)

*Karen Anne Cooke*

Karen Anne Cooke testified that she was in the car with her husband, Jonathon Cooke,

when the stabbing occurred.  (Id. at 501.)  At trial, she identified petitioner as the man who

stabbed Steven Harleman.  (Id.)  Cooke observed petitioner pacing for approximately five

minutes before the stabbing occurred.  (Id. at 502.)

Cooke testified that about an hour before the incident, she saw petitioner with an African

American woman.  (Id. at 503.)

*Vance McHan*

McHan testified that he had been in the auto repossession business for two years.  (Id. at

519.)  His business was called Advanced Financial Recovery.  (Id.)  On the morning of the

incident, he took repossession of a brown Cadillac at the motel where the incident occurred.  (Id.

at 520.)

*Sandra Martinez*

Martinez's testimony begins on page 531 of the reporter's transcript, but this page is

missing from the court's record.

Martinez testified that she worked at S and S Auto for 2 ½ years as the customer services

supervisor.  (Id. at 532.)  Her business sells vehicles.  (Id. at 533.)  Martinez testified that her

business sold a 1999 Cadillac Deville to petitioner, with Kadrena Sheard as a co-buyer.  (Id. at

533-34.)  Martinez testified that at some point, her company made a request for repossession of

the car purchased by petitioner to Advanced Financial Recovery.  (Id. at 543.)  Martinez testified

that the vehicle was repossessed on October 18, 2011, i.e., the date of the incident.  (Id. at 545.)

*Javon Hudson*

Hudson is the general manager of the motel where the incident occurred.  (Id. at 554.)

Hudson was working at the motel on the date of the incident.  (Id. at 559.)  Hudson testified

regarding exhibit 36, a check-in card for room 289.  (Id. at 559-60.)  The guest name on the card

1   was Kadrena Sheard.  (Id. at 560.)  The check-in date was October 17, 2011, i.e., the day before

2   the incident.  (Id. at 561.)

3          Hudson testified that, after the incident, he provided police with video from his video

4   surveillance system at the motel.  (Id. at 564.)  At the trial, some of the video was played for the

5   jury.  (Id. at 564-65.)  This court's record does not include these videos.

6          *Stockton Police Officer Harris*

7          Officer Harris testified that he showed Steven Harleman the photo line-up at the hospital.

8   (Id. at 588.)  Harris testified that Harleman was calm and alert.  (Id. at 605.)  Harlemen picked out

9   petitioner's photo from the photo line-up.  (Id. at 608.)

10         Officer Harris testified that petitioner was arrested on February 10, 2012.  (Id. at 611.)

11  Officer Harris went to the county jail on February 16, 2012, to see petitioner in person.  (Id.)

12  Officer Harris observed that petitioner had gold teeth on the top portion of his mouth.  (Id. at

13  612.)  Officer Harris testified regarding the gold teeth petitioner had when he was arrested,

14  people's exhibit 51.  (Id. at 613.)  When Officer Harris held up the gold teeth, the court described

15  them as "two little teeth."  (Id. at 614.)

16         On cross-examination, Officer Harris testified that when Harleman picked the photo of

17  petitioner, Officer Harris asked him what looks similar to the man who stabbed him.  (Id. at 698.)

18  Harleman responded, "Well, what looks similar are the eyes."  (Id.)  Harleman told Officer Harris

19  that he was not 100% sure that the picture he chose was the man who stabbed him.  (Id. at 699.)

20                 b.  Defense Witnesses

21         Kadrena Sheard and petitioner testified on behalf of the defense.  Sheard testified that on

22  October 18, 2011, she and petitioner were staying at the motel where the incident occurred.  (Id.

23  at 745.)  Sheard testified that they got to the motel by driving the Cadillac they had purchased

24  from S & S Auto Sales.  (Id.)  Sheard testified that when she and petitioner went to check out,

25  their car was gone.  (Id. at 752.)  Sheard testified that she and petitioner said that the car must

26  have been repo'ed.  (Id.)  Sheard and petitioner then went to the motel office to see if they knew

27  what repo company had their car.  (Id. at 754.)  After finding out that the motel had no

28  information, Sheard left the office.  (Id. at 757.)  Sheard returned to the office at least two more

times to get a receipt.  (Id. at 758.)  While Sheard went in and out of the office, petitioner was outside smoking a cigarette.  (Id.)

Sheard testified that after she left the office the third time, she and petitioner left the motel on foot.  (Id. at 759.)  Sheard testified that she did not see petitioner have a fight with anyone.  (Id. at 760.)

Petitioner's testimony regarding what occurred on the morning of October 18, 2011, was consistent with Sheard's testimony.  (Id. at 788-81.)  Petitioner denied fighting with or stabbing anyone at the motel.  (Id.)  On cross-examination, petitioner admitted that he was wearing his gold teeth, identified as People's Exhibit 51, at the time of his arrest in February 2012.  (Id. at 795.)  The prosecutor asked petitioner if he was "wearing this grill" on October 18, 2011.  (Id. at 796.)  Petitioner responded, "Yes, I was wearing a grill."  (Id.)

4. Analysis

From the evidence discussed above, a rational trier of fact could find that petitioner was the man who stabbed Steven Harleman.  While petitioner challenges the credibility and reliability of the witnesses who identified him, their identification was supported by petitioner's undisputed presence at the motel on the morning of the stabbing, the undisputed repossession of his car which apparently led to the initial conflict between Steven Harleman and the stabber, and the witnesses' observation that the stabber had gold teeth, which petitioner admitted he wore on the day of the incident.[3]  In addition, Steven Harleman testified that the man who stabbed him was the man whose car had been repossessed, i.e., petitioner.  Chris Harleman testified that right after the stabbing, Steven Harleman told him that the man who stabbed him was the man whose car had been repossessed.  "[U]nder Jackson, the assessment of credibility of witnesses is generally beyond the scope of review."  Schlup v. Delo, 513 U.S. 298, 330 (1995).  See also Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004) ("A jury's credibility determinations are therefore entitled to near-total deference under Jackson.").

_____

[3]  While the testimony of Steven Harleman and Jonathan Cooke suggested that the stabber wore a full grille, and petitioner's testimony suggested that he wore a partial grille on the date of the incident, the undersigned does not find that this conflict undermines the verdict.

For the reasons discussed above, the undersigned finds that the California Court of Appeal's denial of petitioner's claim alleging that there was insufficient evidence that he was the stabber was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

## V. Claim Two: Alleged Prosecutorial Misconduct

### A. Legal Standard

Prosecutorial misconduct is cognizable in federal habeas corpus. The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power. Darden v. Wainwright, 477 U.S. 168, 181 (1986). A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." Id.; Smith v. Phillips, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). Under Darden, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005). A prosecutorial misconduct claim is decided "on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process." Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995).

### B. State Court Opinion

The California Court of Appeal is the last state court to issue a reasoned decision addressing this claim. The California Court of Appeal denied this claim for the reasons stated herein:

> Defendant contends the prosecutor committed misconduct when she "elicit[ed] evidence in violation of a ruling by the trial court." The evidence was exhibit 49, a booking photograph of defendant with his "gold grill." The factual premise of defendant's argument is wrong because the court's ruling did not prohibit the prosecutor from asking the witness about this evidence.
>
> The facts are as follows: the prosecutor wanted to show the booking photograph of defendant with his "gold grill" to Detective Harris during trial. Out of the presence of the jury, defense counsel objected because "if [the prosecutor is] trying to introduce it as independent

13

evidence of what [defendant] looked like on [the date of the stabbing], a year and a half later, I don't believe that there's a sufficient foundation for that purpose." The court stated that it was "inclined to agree," noting that the prosecutor has "not connected gold teeth to [defendant] in the trial yet." The court continued that the prosecutor "need[s] to put that evidence on ... you need to lay a foundation, what the foundational evidence about his gold teeth at the time of his arrest, and then—*at this point* I'm going to sustain the objection." (Italics added.)

The prosecutor then explained to the court that "the last part of [her] questioning with [the] detective is going to be the fact that he met ... that once the defendant was arrested ... the first thing [the detective] noticed was the defendant had gold teeth, and at that point, I would be seeking to introduce the photograph...." "Asking the [detective] if that is what he looked like in terms of the gold teeth." The court then stated, *"I think [the prosecutor] can do that."* (Italics added.) The prosecutor then asked the court to clarify its ruling "just to make sure that I do this right." The court stated the detective could testify to *"[a]nything he observed.... If he observed [the defendant], he can testify to his observation."* (Italics added.)

After the court made its final ruling, Detective Harris continued his testimony. The prosecutor asked the detective whether he "noticed [anything] about [defendant]'s physical appearance in particular." The detective responded that defendant "had gold teeth on the top portion of his mouth." The prosecutor then showed defense counsel the booking photograph of defendant with his "gold grill" and then showed it to the detective. The prosecutor asked the detective if the "teeth that you have[ ] testified to ... does that photograph accurately depict [defendant], the goldness of the teeth...." The detective replied, "Yes."

These facts show that the court's final ruling actually allowed the prosecutor to ask Detective Harris about exhibit 49, the booking photograph of defendant with his "gold grill." As such, there was no error (misconduct or otherwise) in the prosecutor asking the witness about this photograph.

People v. Watts, 2014 WL 6480473 at *2-3.

C. Discussion

For the reasons stated herein, the undersigned finds that California Court of Appeal incorrectly found that the trial court allowed the prosecutor to ask Detective Harris about exhibit 49. However, the undersigned finds that the alleged prosecutorial misconduct did not violate petitioner's right to due process.

////

////

14

As discussed above, exhibit 49 was petitioner's May 21, 2010 booking photo, blown up to approximately 8 by 11 inches. (RT at 591-2.) At a 402[4] hearing, Officer Harris testified that he used this photo in the photo line-up that he made to show witnesses. (Id. at 591.) Officer Harris testified that when he makes photo line-ups, he tries to find the most recent picture of the target person that he can, and he found this photograph in the Stockton Records Management System as a booking photograph of petitioner from May 21, 2010. (Id.) Officer Harris testified that he used a black colored marker to mark out the teeth area of each photograph used in the photo line-up. (Id.) The photo line-up was exhibit 21. (Id.) As discussed herein, exhibit 49 apparently showed petitioner wearing a "full grille" of gold teeth, which were not marked out.

Petitioner's counsel initially objected to exhibit 49 because it was not relevant to the issue of the witnesses' identification of petitioner by way of the photo line-up. (Id. at 592.) Counsel went on to argue,

> To the extent that this is being offered for some independent purpose, I don't believe there's sufficient foundation that that, in fact, that photo, People's 49 was, in fact, the photo taken of my client by the jail on May 21st, 2010, that if they're trying to introduce it as independent evidence of what my client looked like on October 18, 2011, a year and a half later, I don't believe that there's sufficient foundation for that purpose.

(Id. at 593-94.)

The trial court then stated that it was inclined to agree with defense counsel. (Id. at 594.) The prosecutor responded that the photo was relevant to show petitioner's gold teeth. (Id.) The court stated that the prosecutor had not introduced any evidence connecting Officer Harris to the gold teeth. (Id.)

> Prosecutor: Well, I can also do that with the offer of proof, that when the defendant was picked up on the Ramey warrant in February of 2012 and the officer saw him at the county jail, the first thing he noticed was that the defendant had gold teeth.
>
> Court: Well, I think you need to put that evidence on and then we'll deal with this. So you need to lay a foundation, what the foundational

---

[4] California Evidence Code section 402(b) provides that the court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury.

1  evidence about his gold teeth at the time of his arrest, and then – at
   this point I'm going to sustain the objection.
2
                                         ****
3
4  Prosecutor:  So I understand in terms of the questioning regarding
   the photographic lineup that I'm not going to be able to show my
   officer that photograph and ask him about it at this point; however,
5  the last part of my questioning with my detective is going to be the
   fact that he met – that once the defendant was arrested, he went to
6  confirm that the defendant was in custody in San Joaquin County jail,
   that was in February of 2012, and then at that point he will testify
7  that the defendant, he noticed –the first thing he noticed was the
   defendant had gold teeth, and at that point I would be seeking to
8  introduce the photograph to –

9  Court:  The booking photo that he had?

10 Prosecutor:  Asking the officer if that is what he looked like in terms
   of the gold teeth.
11
   Court:  I think she can do that.
12

13 (Id. at 594-96.)

14    The prosecutor went on to ask Officer Harris if he noticed petitioner's gold teeth when he

15 saw him at the jail on February 16, 2012.

16 Prosecutor:  When you saw him, was there anything you noticed
   about his physical appearance in particular?
17
   Officer Harris:  Yes.
18
   Prosecutor:  And what was that?
19
   Officer Harris:  He had gold teeth on the top portion of his mouth.
20 They were the color gold.

21 Prosecutor:  All right.  And I'm going to show you what's been
   previously marked as the People's Exhibit 49.  Showing the defense.
22
   Defense Counsel:  Yes.
23
   Prosecutor:  Do you recognize the People's 49?
24
   Officer Harris:  Yes.
25
   Prosecutor:  And who is that photograph of?
26
   Officer Harris:  Shemick Watts.
27
   Prosecutor:  And the teeth that you have testified to, does that –does
28 that photograph accurately depict Shemick Watts, the goldness of the

                                      16

teeth, I guess, for lack of a better word, on February 16th of 2012?

Officer Harris: Yes.

(Id. at 611-12.)

The next day, the trial court stated that the prosecutor had not obeyed his order regarding use of petitioner's booking photo, i.e., exhibit 49:

> Back on the record in the matter of People versus Watts. Mr. Watts' counsel, and the Deputy District Attorney are here. I considered last night our discussions and thought about it, and I do believe that the testimony exceeded my order in two respects.
>
> Number one, Detective Harris wasn't supposed to identify photo number 2 in the photographic exhibit; *and secondly, when I did say he could identify Mr. Watts as the person he saw at the jail, I expected you guys to use the most recent booking photo rather than the same one you used in Exhibit 21. So therefore, I believe those are beyond the scope of my ruling. I'm going to order that they be stricken and I'm going to read this to the jury.*

(Id. at 676 (italics added).)

The court, the prosecutor and defense counsel went on to discuss the court's first concern, i.e, Detective Harris was not supposed to identify photo number 2 in the photographic exhibit. (Id. at 676-80.) The parties did not discuss the court's concerns regarding the use of exhibit 49.

Later, the trial court denied the prosecutor's request to admit exhibit 49 because "it shouldn't have come in based on my original ruling." (Id. at 722.)

Petitioner later moved for a new trial based, in part, on the prosecutor's introduction of exhibit 49. In the new trial motion, petitioner made the following arguments:

> Mr. Harleman described the attacker, among other things, as also having a gold teeth caps, commonly called a "grille," in his mouth. It was a full set covering the entire upper set of teeth.
>
> When arrested four months later, defendant had a partial "grille" in his possession, not a full "grille."
>
> While in the hospital being treated for his injuries sustained in the attack, Mr. Harleman was shown a photographic line-up by Detective Harris from the Sheriff's Department, which included a picture of Mr. Watts from some years ago. In this old picture, Mr. Watts was wearing a full-set gold "grille," so Detective Harris took the precaution to black out his teeth (as well as the teeth of everyone else in the six-pack).

*** 

> The court also ruled that the People may not show a larger version of the line-up photograph, People's Exhibit 49, to the jury because it was not a current photograph of defendant, having been taken some year-and-a-half prior. It is important to realize that this photograph did not have the teeth blacked out like in the smaller, six pack version. Thus, this photograph would be highly prejudicial because the victim reported an attacker with a full "grille," and this very old photograph is one of defendant with a "full "grille," whereas defendant was arrested four months after the crime with a partial "grill" (two caps only) in his possession. However, despite this ruling, the People apparently put this inadmissible photograph onto the overhead projector in front of the jury, thus allowing the jury to see the prejudicial photograph.

(CT at 261-62)

The trial court denied the motion for a new trial on these grounds:

> I do believe there was misconduct by the People. That was in violation of the court order, however I don't believe it rises to being prejudicial. I think there's overwhelming evidence of Mr. Watts' guilt. I think under any standard, the state's standard of substantial prejudice or a federal one of proof beyond a reasonable doubt, that it wasn't prejudicial. I think the err here was not prejudicial in showing the photo to the jury. I think the evidence was overwhelming that Mr. Watts was guilty of the crime from the multiple witnesses, the fact that he was there and all the other corroborating evidence, so I'm going to deny the motion for new trial.

(Id. at 952.)

*Analysis*

The California Court of Appeal found that no prosecutorial misconduct occurred because the trial court ruled that the prosecutor could show Officer Harris exhibit 49. As discussed above, the trial court actually ruled that the prosecutor could show Officer Harris petitioner's recent booking photo, and not Exhibit 49.[5]

After reviewing the record, it appears that both the prosecutor and defense counsel, perhaps not unreasonably, misinterpreted the trial court's initial ruling to allow the prosecutor to ask Officer Harris about exhibit 49 after laying a proper foundation. However, for the reasons

---

[5] Officer Harris testified that when he made the photo line-up he used the most recent photo of petitioner that he could find, i.e. petitioner's May 2010 booking photo. It is not clear why a more recent photo of petitioner was not available.

18

discussed herein, the undersigned finds the jury's viewing of exhibit 49 did not prejudice petitioner because of the strong evidence that petitioner stabbed Steven Harleman. For this reason, the undersigned need not decide whether the prosecutor acted improperly when questioning Officer Harris about exhibit 49.

As discussed above, petitioner testified that he was present at the motel on the morning of the incident. Petitioner also testified that his car was repossessed. Petitioner also testified that he wore a grille, i.e., gold teeth, on the morning of the incident. Whether he testified to wearing the full or partial grille is not entirely clear, because he testified that he wore "a grille." Steven Harleman testified that the man who attacked him was the man whose car had been repossessed, i.e., petitioner. Steven Harleman and Jonathon Cooke both testified that the man who attacked Harleman was African American and had gold teeth. Steven Harleman picked petitioner's photo out of the photo line-up after the stabbing. The undersigned agrees with the trial court that the evidence that petitioner stabbed Steven Harleman was overwhelming.

The testimony of Steven Harleman and Jonathan Cooke suggested that the stabber wore a full grille of gold teeth. However, petitioner had two gold teeth when he was arrested in February 2012, i.e., a partial grille. While exhibit 49 showed petitioner with a full grille, considering the strong evidence that petitioner stabbed Steven Harleman, the undersigned cannot find that the jury's viewing of exhibit 49 had any impact on the outcome of the trial.

The undersigned also observes that the jury was instructed to decide the case based only on the evidence that was presented in the courtroom. (CT at 219.) The jury was instructed that "'Evidence' is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence." (Id.) As discussed above, exhibit 49 was not admitted into evidence. It is well established that juries are presumed to follow the court's instructions. See Weeks v. Angelone, 528 U.S. 225, 234 (2000). It is unlikely that the jury in petitioner's case disregarded this instruction and considered exhibit 49. See Greer v. Miller, 483 U.S. 756, 766 n. 8 (1987) (jury is presumed to follow instructions to disregard inadmissible evidence, unless there is overwhelming probability it will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the

defendant).

The California Court of Appeal erred when it found that the prosecutor did not disobey the trial court's order regarding Exhibit 49. A state court decision based on an unreasonable determination of the facts requires the federal court to evaluate the petitioner's claim de novo. Hurles v. Ryan, 752 F.3d 768, 778 (9th Cir. 2014). Applying a de novo standard of review, the undersigned finds that petitioner's prosecutorial misconduct claim is without merit because petitioner was not prejudiced by the alleged misconduct. Accordingly, this claim should be denied.[6]

## VI. Claim Three:  Alleged Jury Instruction Error

Petitioner alleges that the trial court read CALCRIM 372 in error because the evidence did not support this instruction. Petitioner also alleges that CALCRIM 372 contained an impermissible inference.

### A. Legal Standard

To obtain federal habeas relief for an error in the jury instructions, a petitioner must show that the error "so infected the entire trial that the resulting conviction violates due process." Estelle v, McGuire, 502 U.S. 62, 72 (1991). "Even if there is some 'ambiguity, inconsistency, or deficiency' in [a jury] instruction, such an error does not necessarily constitute a due process violation." Waddington v. Sarausad, 555 U.S. 179, 190 (2009) (quoting Middleton v. McNeil, 541 U.S. 433, 437 (1977)). "Rather, the defendant must show both that the instruction was ambiguous and that there was "'a reasonable likelihood'" that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." Waddington, 555 U.S. at 190-91 (quoting Estelle, 502 U.S. at 72) (internal quotation marks and citation omitted); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous, or

---

[6]  In the brief filed in petitioner's direct appeal, respondent appears to argue that the prosecutor committed misconduct by showing Officer Harris exhibit 49, but that this misconduct did not prejudice petitioner.  (Respondent's Lodged Document 10 at 11-12.)  In contrast, in the answer to the instant petition, respondent argues that the California Court of Appeal reasonably found that the trial court ruled that the prosecutor could ask Detective Harris about exhibit 49.  (ECF No. 19 at 20.)

even "universally condemned," but that it violated some [constitutional right].'").

If a constitutional error is found in the jury instructions, the federal habeas court also must determine whether that error was harmless by looking at the actual impact of the error. Calderon v. Coleman, 525 U.S. 141, 146-47 (1998). The habeas court must apply the harmless-error test set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993), and determine whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623.

B. Opinion of California Court of Appeal

The California Court of Appeal is the last state court to issue a reasoned decision addressing this claim. The California Court of Appeal denied this claim for the reasons stated herein.

> Over defense objection, the trial court instructed on defendant's flight pursuant to CALCRIM No. 372. The instruction stated, "If the defendant fled or tried to flee immediately after the crime was committed, that conduct may show he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

> Defendant contends the instruction should not have been given for two reasons. One, he did not flee. Rather, he was "simply returning home after an overnight stay at the Motel 6." Two, the instruction contained an improper and irrational inference of guilt from flight because "it is not more likely than not that one who flees from police is necessarily guilty of the charged offense." In this way, according to defendant, the instruction violated his federal constitutional rights to due process of law and a jury trial with proof of guilt beyond a reasonable doubt.

> As to one, defendant is wrong because "the circumstances of [his] departure ... suggest[ed] 'a purpose to avoid being observed or arrested.'" (People v. Bonilla (2007) 41 Cal.4th 313, 328.) After defendant stabbed the victim and went up to the C.'s car and asked Jonathan C., "[d]o you want some of this," defendant went to a little alley. The C.'s looked for defendant, but they could not find him. This evidence was sufficient to warrant giving the flight instruction.

> As to two, arguments very similar to defendant's constitutional arguments have been rejected by the California Supreme Court and our court, and we follow the reasoning of those opinions here.

> Regarding due process, the California Supreme Court has explained the following with respect to the predecessor instruction to

CALCRIM No. 372, which was CALJIC No. 2.52. "A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury. [Citations.] This test permits a jury to infer, if it so chooses, that the flight of a defendant immediately after the commission of a crime indicates a consciousness of guilt. Thus, here the flight instruction does not violate due process." (People v. Mendoza (2000) 24 Cal.4th 130, 180.)

Regarding a jury trial with proof beyond a reasonable doubt, we have explained the following: "Even viewing the instruction in isolation, the word 'if' in the operative clause—'If the defendant fled or tried to flee immediately after the crime was committed'—does not logically modify only the phrase 'the defendant fled or tried to flee,' as defendant contends. Rather, 'if' modifies the entire phrase, including the words 'after the crime was committed.' Thus, it is highly unlikely a reasonable juror would have understood the instruction as dictating that 'the crime was committed.' [Citation.] [¶] This conclusion is supported by the other instructions, which told the jury the following things (among others): (1) 'You must decide what the facts are'; (2) 'It is up to all of you and you alone to decide what happened'; (3) 'A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt[ ]'; and (4) 'Remember that you may not convict a defendant of any crime unless you are convinced that each fact essential to the conclusion that the defendant's guilt [ ] of that crime has been proved beyond a reasonable doubt.'" (People v. Paysinger (2009) 174 Cal.App.4th 26, 30.) These same additional instructions were given here. Finally, as in Paysinger, there was no question that a crime occurred; the question was only who did it. (Id. at p. 31.) Under these circumstances, the jury did not likely misunderstand CALCRIM No. 372 in a way that "undermined the presumption of innocence or tended to relieve the prosecution of the burden to prove defendant's guilt beyond a reasonable doubt." (Paysinger, at p. 31.)

People v. Watts, 2014 WL 6480473 at *3.

    3. Analysis

The jury was read CALCRIM 372:

If the defendant fled or tried to flee (immediately after the crime was committed) that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself.

(CT at 237.)

////

22

*Was There Evidence that Petitioner Fled or Tried to Flee?*

2        The evidence presented at trial demonstrated that petitioner did not stay at the motel after

3    the incident.  As noted by the California Court of Appeal, Jonathan Cooke testified that after

4    petitioner stabbed Steven Harleman, he approached the car where Jonathan Cooke was sitting.

5    (RT at 377.)  Petitioner said to Cooke, "You want some of me, too?"  (<u>Id.</u> at 379.)  Cooke drove

6    the car toward petitioner.  (<u>Id.</u> at 382.)  Cooke then saw petitioner leave.  (<u>Id.</u> at 383.)   Because

7    the prosecutor presented some evidence of petitioner's fleeing the motel after stabbing Steven

8    Harleman, the trial court did not violate petitioner's due process rights when it read CALCRIM

9    372.

10       Even assuming the trial court read CALCRIM 372 in error, this error did not have a

11   substantial and injurious effect on the jury's verdict because the prosecutor presented substantial

12   evidence that petitioner was the man who stabbed Steven Harleman.  As discussed above, several

13   witnesses identified petitioner as the man with gold teeth who stabbed Steven Harleman.  These

14   identifications were supported by the undisputed evidence that petitioner was present at the motel

15   on the morning of the incident and had gold teeth.  In addition, it was undisputed that petitioner's

16   car had been repossessed, which led to the incident with Steven Harleman.

17       For the reasons discussed above, the denial of this claim by the California Court of Appeal

18   was not an unreasonable application of clearly established Supreme Court authority.

19   Accordingly, this claim should be denied.

20       Did *CALCRIM 372 Contain an Impermissible Inference?*

21       Here, there is no reasonable likelihood that the jury applied CALCRIM 372 in a way that

22   violated the Constitution.  The Ninth Circuit has held that flight instructions, such as the one here,

23   do not violate due process when those instructions do not declare that flight equals guilt and do

24   not require the jury to draw an inference of guilt from flight.  See <u>Karis v. Calderon</u>, 283 F.3d

25   1117, 1132 (9th Cir. 2002) (declining to find a flight instruction fundamentally unfair where

26   instruction stated that flight alone was insufficient to establish guilt and did not direct jury to

27   ignore defendant's explanation for his flight).  Other circuits have held the same.  <u>See, e.g.</u>,

28   <u>Burton v. Renico</u>, 391 F.3d 764, 778 (6th Cir. 2004) ("Because the jury instruction directed jurors

to make their own determinations as to whether Burton did in fact flee and if so, what state of mind such flight evinced, the trial judge's instruction regarding flight was not so prejudicial as to render the entire trial fundamentally unfair''); Nguyen v. Reynolds, 131 F.3d 1340, 1357 (10th Cir. 1997) (where trial court had instructed jury that defendant "was presumed innocent and had to be proven guilty beyond a reasonable doubt'' and "[n]othing in the flight instruction controverted those general instructions,'' the flight instruction did not violate due process).

In the instant action, CALCRIM 372 did not lower the prosecution's burden of proof. The instruction did not assume that flight had been established. The instruction carefully limited how the jury could use any evidence of flight. Not only did the instruction provide that it was for the jury to determine whether petitioner had actually tried to flee or had fled the crime scene, the instruction also left it up to the jury to determine whether any such flight indicated guilt. The instruction also left it to the jury to decide how much weight to give to any such flight. The instruction also clearly stated that evidence of flight was insufficient on its own to prove petitioner's guilt. Moreover, as the California Court of Appeal correctly observed, the challenged instruction has to be viewed in the context of the overall jury charge. Here, the other instructions given to the jury included standard instructions on the presumption of innocence and the prosecutor's burden of proof beyond a reasonable doubt.

For the reasons discussed above, the denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

VII. Claim 4: Alleged Brady Error

A. Legal Standard

In Brady v. Maryland, 373 U.S. 83 (1963), the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The duty to disclose such evidence is applicable even though there has been no request by the accused. United States v. Agurs, 427 U.S. 97, 107 (1976). The duty encompasses impeachment evidence in addition to exculpatory

evidence. <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985). A <u>Brady</u> violation may also occur when the government fails to turn over evidence that is "known only to police investigators and not to the prosecutor." <u>Youngblood v. West Virginia</u>, 547 U.S. 867, 870 (2006) (quoting <u>Kyles v. Whitley</u>, 514 U.S. 419, 437, 438 (1995) ["the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"]).

As stated in <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999), three components are required to establish a <u>Brady</u> violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>See also</u> <u>Banks v. Dretke</u>, 540 U.S. 668, 691 (2004); <u>Silva v. Brown</u>, 416 F.3d 980, 985 (9th Cir. 2005). "The prosecutor, although 'not required to deliver his entire file to defense counsel,' is required to turn over evidence that is both favorable to the defendant and material to the case." <u>Amado v. Gonzalez</u>, 758 F.3d 1119, 1134 (9th Cir. 2014) (quoting <u>Bagley</u>, 473 U.S. at 675).

A defendant is prejudiced by a <u>Brady</u> violation if the evidence that was not produced is material. <u>Amado v. Gonzalez</u>, 758 F.3d at 1134. Evidence is material if "'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." <u>Strickler</u>, 527 U.S. at 289. "The question is not whether petitioner would more likely than not have received a different verdict with the evidence, but whether 'in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." <u>Id.</u> (quoting <u>Kyles</u>, 514 U.S. at 434); <u>see also</u> <u>Silva</u>, 416 F.3d at 986. Once the materiality of the suppressed evidence is established, no further harmless error analysis is required. <u>Kyles</u>, 514 U.S. at 435-36; <u>Silva</u>, 416 F.3d at 986. "When the government has suppressed material evidence favorable to the defendant, the conviction must be set aside." <u>Silva</u>, 416 F.3d at 986.

B. <u>Analysis</u>

The San Joaquin County Superior Court is the last state court to issue a reasoned decision regarding this claim. The San Joaquin County Superior Court denied this claim for the reasons

1  stated herein:

> 2     Petitioner challenges his conviction on the grounds of newly
> 3 discovered evidence, which he contends establishes a violation of his
>   rights pursuant to <u>Brady v. Maryland</u> (1963) 373 U.S. 83, 83 S.Ct.
>   1194, 1169-1197 (prosecutor fails to disclose criminal history of a
> 4 material witness).  Petitioner attaches a portion of the transcript of
>   his preliminary hearing and a declaration of a private investigator
> 5 attaching computer printouts relating to a witness, to support his
>   Petition.  The preliminary hearing transcript is not new evidence.
> 6 The computer printouts are inadmissible hearsay.  Even if the
>   computer printouts were admissible evidence, they would not
> 7 establish a <u>Brady</u> violation because petitioner has presented
>   insufficient evidence regarding what <u>Brady</u> material was disclosed to
> 8 the defense regarding the witness.
>
> 9     Further, none of the materials petitioner attaches to his petition
>   demonstrate that he is actually innocent, "undermine the entire
> 10 prosecution case," or "point unerringly to innocence or reduced
>   culpability." <u>In re Lawley</u> (2008) 42 Cal.4th 1231, 1238.

11

12  Respondent's Lodged Document 16.

13      Petitioner does not attach the preliminary hearing transcripts, private investigator

14  declaration or computer printouts, discussed by the Superior Court, to the instant petition.

15  Respondent also failed to provide a copy of petitioner's habeas petition filed in the Superior

16  Court, which apparently includes these documents.  While respondent's lodged document 15 is

17  identified as the Superior Court petition, it instead contains a copy of the petition filed in this

18  court.  Accordingly, respondent is ordered to submit a copy of the Superior Court petition.

19      The preliminary hearing transcript and private investigator report, discussed by the

20  Superior Court, are attached to petitioner's habeas petition filed in the California Supreme Court,

21  respondent's lodged document 18.  Petitioner attaches pages from the preliminary hearing where

22  the prosecutor asks Steven Harleman about his prior convictions.  (<u>See</u> Respondent's Lodged

23  Document 3.)  The prosecutor asked Harleman if he had three prior felony convictions for 1)

24  October 7, 2005, taking or driving a motor vehicle; 2) October 7, 2005, evading police; and 3)

25  December 7, 2007, felony taking or driving a motor vehicle.  (<u>Id.</u> at 25-26.)

26      Attached to the petition filed in the California Supreme Court is a declaration of private

27  investigator Jerry Swanson dated June 7, 2015.  (Respondent's Lodged Document 18.)  In his

28  declaration, Swanson states that on June 7, 2015, he ran searches on three different web sites with

information regarding criminal convictions and obtained information for Steven Harlemen. (Id.) Swanson's declaration discusses these reports. (Id.) Swanson states "refer to the actual aforementioned reports for complete details." (Id.) The reports are apparently the computer printouts referred to by the California Superior Court. These reports/printouts are not attached to the petition filed in the California Supreme Court.

At the outset, it appears that petitioner may have cited the transcript from the preliminary hearing as evidence that the prosecution failed to disclose all of Harleman's criminal record. In other words, petitioner has presented evidence regarding what Brady evidence was disclosed to the defense regarding Steven Harleman, i.e., the three convictions discussed at the preliminary hearing. Petitioner is claiming that the prosecutor failed to disclose Harleman's additional criminal record, discovered by private investigator Swanson.

For purposes of these findings and recommendations, the undersigned assumes that the records discussed in Swanson's declaration are the records of victim Steven Harleman. Based on the record before this court, the undersigned cannot make any finding regarding whether the prosecutor, either willfully or inadvertently, failed to disclose those records. However, for the reasons stated herein, the undersigned finds that those records were not material, in that there is no reasonable probability that the outcome of the trial would have been different had those records been disclosed.

In his declaration, Swanson states that he obtained the following information from the search site "Blackbooinfor.com" regarding Steven Harleman: in Kern County case #LF005867a, Steven Harleman was charged with possession of a controlled substance, DUI, under the influence of a controlled substance and driving without a license. (Respondent's Lodged Document 18.) Swanson states that on January 28, 2004, all counts were dismissed "furh of justice." (Id.)

It is unlikely that the dismissed charges, described above, would have been admissible to impeach Harleman, especially because the defense knew of Harleman's convictions discussed at the preliminary hearing, which could be offered as impeachment evidence. See People v. Brown, 31 Cal.4th 518, 545 (2003) ("Moreover, reliance on Evidence Code section 352 to exclude

evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination.") Accordingly, these dismissed charges are not material.

Swanson states that he obtained the following information from the Search Site "TLO/Transunion" regarding Steven Harleman from Los Angeles County: "1) Case #56109901 Offense 454 PC (Burglary) a felony. No date provided. 2) Case #56109901 Offense 'Unspecified,' a felony. No date." (Id.)

The burglary charge found in the TLO/Transunion site is not dated. The Swanson declaration also does not state whether Harleman was convicted of this burglary. For these reasons, the undersigned finds that this offense is not material. The second felony found in the TLO/Transunion site is "unspecified," not dated, and it is not clear whether Harleman was convicted of this unidentified offense. For these reasons, this offense is also not material.

Swanson states that he obtained the following information from the search site "American Driving Records/Department of Motor Vehicles" regarding Steven Harleman: 1) cited on June 7, 2005 and convicted October 4, 2005 of 23152A (DUI alcohol and/or drugs et al.), in South Kern County; and 2) cited July 17, 2014 for possession of drug paraphernalia, possession and use of a controlled substance, in South Kern County. (Respondent's Lodged Document 18.)

The 2014 Kern County drug charges, listed above, are not material because they occurred after petitioner's conviction.

The undersigned concludes that the Swanson report identifies one offense which may have been offered to impeach Harleman: the October 4, 2005 DUI conviction. However, there is no reasonable probability that the outcome of the trial would have been different had this conviction been earlier disclosed. As discussed above, the defense had knowledge of Harleman's other criminal convictions. In addition, the evidence against petitioner was strong. Harleman's testimony was corroborated by other witnesses. The undersigned is confident that the outcome of petitioner's trial would not have been different had this evidence been disclosed. See Benn v. Lambert, 283 F.3d 1040, 1052-53 (9th Cir. 2002) (explaining that to warrant relief under Brady, undisclosed evidence must undermine confidence in the outcome of the trial).

The denial of this claim by the Superior Court was not an unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim should be denied.

VIII.  Alleged Ineffective Assistance of Counsel

A.  Background

On September 19, 2017, petitioner filed a supplemental petition, captioned "Request Evidentiary Hearing." (ECF No. 21.)  The supplemental petition raised one claim alleging that trial counsel was ineffective for failing to object to the introduction of exhibit 49, petitioner's booking photo discussed above.  Petitioner argued that this photo was from a May 2010 arrest, and not his current booking photo.  (Id.)  Petitioner argued that use of this old photo bolstered the prosecution's case.[7]

On May 2, 2018, the undersigned issued an order finding that petitioner could not amend his petition as of right, but must be granted leave to amend by the court unless respondent consented in writing to the amendment.  (ECF No. 24.)  The undersigned also observed that it did not appear that petitioner had exhausted the ineffective assistance of counsel claim raised in the supplemental petition.  (Id.)  The undersigned granted petitioner thirty days to file a motion to amend addressing whether he exhausted the ineffective assistance of counsel claim.  (Id.)

Thirty days passed from May 2, 2018 and petitioner did not file a motion to amend.  Instead, petitioner filed a letter to the court stating that he did not understand the May 2, 2018 order.  (ECF No. 28.)  Petitioner attached documents indicating that the California Supreme Court denied the petition raising the ineffective assistance of counsel claim on April 19, 2017.  (Id. at 5.)

Despite petitioner's failure to properly raise his ineffective assistance of counsel claim in a motion to amend, the undersigned addresses this claim herein.

_____

[7]  In the supplemental petition, petitioner claimed that appellate counsel raised this claim on appeal, but the issue was never addressed.  (ECF No. 21.)  Petitioner's opening brief on appeal raised an ineffective assistance of counsel claim based on trial counsel's failure to object to the prosecutor's misconduct. (Respondent's Lodged Document 9.)  The pages from this brief containing this argument are missing from the court's copy of this brief.  Petitioner did not raise this issue in the petition for review filed in the California Supreme Court.  (Respondent's Lodged Document 13.)  Respondent is ordered to submit a complete copy of the opening brief.

The California Supreme Court denied petitioner's habeas petition raising his ineffective assistance of counsel claim by order citing In re Clark, 5 Cal.4th 750, 767-69 (1993), People v. Duvall, 9 Cal.4th 464, 474 (1995), and In re Swain, 34 Cal.2d 300, 304 (1949).

The citation to Clark, supra, indicates that the California Supreme Court did not reach the merits of petitioner's claims but, rather, determined that the petition was procedurally barred as a successive petition.  See In re Clark, 5 Cal.4th at 767-69.

The Ninth Circuit has held that the California Supreme Court's citation to Swain indicates that the state habeas petitioner failed to state facts with sufficient particularity to support a claim. Kim v. Villalobos, 799 F.2d 1317, 1319 (9th Cir. 1986).  The cite to Duvall stands for a similar proposition.  See Duvall, 9 Cal. 4th at 474; see also Cross v. Sisto, 676 F.3d 1172, 1176–77 (9th Cir. 2012).  As the Ninth Circuit has explained, "a Swain/Duvall dismissal affords the petitioner the opportunity to refile an amended pleading that allege[s] with sufficient particularity the facts warranting habeas relief."  Howard v. Campbell, 305 Fed.Appx. 442, 445 (9th Cir. 2008) (citation and internal quotation marks omitted, alteration in original); see also Kim, 799 F.2d at 1319.

The citations to Clark, Swain and Duvall suggest that petitioner's ineffective assistance of counsel claims is procedurally defaulted and not exhausted.  Nevertheless, the undersigned herein considers the merits of this claim.  See Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997); see also Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002): ("Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same"); 28 U.S.C. § 2254 (b)(2) (habeas corpus petition may be denied on the merits, notwithstanding the failure of the applicant to exhaust state court remedies).

The undersigned reviews petitioner's ineffective assistance of counsel claim de novo because the California Supreme Court did not address the merits of this claim.  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002); see also Berghuis v. Thompkins, 560 U.S. 370, 390 (2010) (where it is unclear whether AEDPA deference applies, courts may deny writs of habeas corpus under Section 2254 by engaging in de novo review); Mason v. Holt, 2016 WL 6136076, at *5 (E.D. Cal. Oct. 21, 2016 (applying de novo review where the state supreme court denied

petitioner's habeas petition with citation to <u>Clark,</u> <u>Duvall,</u> and <u>In re Swain</u>, 34 Cal. 2d 300, 304

(1949)).[8]

B. <u>Legal Standard</u>

The clearly established federal law governing ineffective assistance of counsel claims is

<u>Strickland v. Washington</u>, 466 U.S. 668 (1984). In a petition for writ of habeas corpus alleging

ineffective assistance of counsel, the court must consider two factors. <u>Strickland</u>, 466 U.S. at

687. First, the petitioner must show that counsel's performance was deficient, requiring a

showing that counsel made errors so serious that he or she was not functioning as the "counsel"

guaranteed by the Sixth Amendment. <u>Id.</u> at 687. The petitioner must show that counsel's

representation fell below an objective standard of reasonableness and must identify counsel's

alleged acts or omissions that were not the result of reasonable professional judgment considering

the circumstances. <u>Richter</u>, 562 U.S. at 105 ("The question is whether an attorney's

representation amounted to incompetence under 'prevailing professional norms,' not whether it

deviated from best practices or most common custom.") (citing <u>Strickland</u>, 466 U.S. at 690).

Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong

presumption that counsel's conduct falls within the wide range of reasonable professional

assistance. <u>Strickland</u>, 466 U.S. at 687. A reviewing court should make every effort "to

eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

challenged conduct, and to evaluate the conduct from counsel's perspective at that time." <u>Id.</u> at

689.

Second, the petitioner must show that there is a reasonable probability that, but for

counsel's unprofessional errors, the result would have been different. It is not enough "to show

that the errors had some conceivable effect on the outcome of the proceeding." <u>Strickland</u>, 466

U.S. at 693. "A reasonable probability is a probability sufficient to undermine confidence in the

---

[8]  The Superior Court denied petitioner's habeas petition raising his ineffective assistance of counsel claim with citation to <u>Duvall</u>, <u>supra</u>, and also on grounds that the petition failed to establish that trial counsel's performance prejudiced petitioner. (ECF No. 28 at 2.) The California Court of Appeal denied petitioner's habeas petition without comment or citation. (<u>Id.</u> at 4.)

outcome." Id. at 694.  A court "asks whether it is 'reasonable likely' the result would have been different.... The likelihood of a different result must be substantial, not just conceivable."  Richter, 562 U.S. at 111–12 (citing Strickland, 466 U.S. at 696, 693).  A reviewing court may review the prejudice prong first.  See Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002).

C. Analysis

Petitioner's trial counsel did not object when the prosecutor asked Officer Harris about exhibit 49.  However, as discussed above, it appears that both trial counsel and the prosecutor, perhaps not unreasonably, believed that the trial court had ruled that the prosecutor could ask Officer Harris about exhibit 49 if the prosecutor laid a proper foundation.  For this reason, the undersigned declines to consider whether petitioner's trial counsel acted unreasonably in failing to object when the prosecutor asked Officer Harris about exhibit 49.

Instead, the undersigned finds that petitioner was not prejudiced by trial counsel's failure to object, because it is not likely that the outcome of the trial would have been different had an objection by trial counsel to exhibit 49 been sustained.  As discussed above, the evidence that petitioner stabbed Steven Harleman was strong.  Based on this strong evidence, it is very unlikely that the jury's viewing of exhibit 49 had an impact on the verdict.

Having conducted a de novo review of the record, the undersigned finds that petitioner's ineffective assistance of counsel claim is without merit and should be denied.

Accordingly, IT IS HEREBY ORDERED that within fourteen days of the date of this order, respondent shall submit 1) page 531 of the reporter's transcript; 2) a copy of the petitioner's habeas corpus petition filed in the Superior Court; and 3) a complete copy of the opening brief filed by petitioner's counsel.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: April 22, 2019

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Watt2199.157